UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANNA BELCHIKOV (a/k/a ANNA DAYN),<br><br>Plaintiff,<br><br>vs.<br><br><br>XTP IMPLEMENTATION SERVICES, INC., XTP AG (a German *Aktiengesellschaft*), XTP AG (a Swiss *Aktiengesellschaft*), WOLFRAM KLINGLER, NIKOLAI DÖRDRECHTER and PHILIPP HENRICH,<br><br>Defendants. | **COMPLAINT** |

Comes now the plaintiff, ANNA BELCHIKOV, also known as ANNA DAYN ("Dayn"), by and through her undersigned counsel, and as and for her complaint against Defendants (1) XTP IMPLEMENTATION SERVICES, INC. ("XTP US"), (2) XTP AG (a German *Aktiengesellschaft*) ("XTP Germany"), (3) XTP AG (a Swiss *Aktiengesellschaft*) ("XTP Switzerland"), (4) WOLFRAM KLINGLER ("Klingler"), (5) NIKOLAI DÖRDRECHTER ("Dördrechter") and PHILIPP HENRICH ("Henrich")(each a "Defendant" and together, the "Defendants"), states as follows:

## INTRODUCTION

1.      In or about 2016, XTP "group" ("XTP")[1], a German- and Swiss-headquartered business, hired Dayn so she could set up and grow a US branch for their business, headquartered in New York.

---

[1]      The term XTP refers to and includes, among other things, the XTP Entities, as that term is defined below.

2.      For the next several years, Defendants employed Dayn full-time as the head of their US business, both prior to and after incorporation of that business as defendant XTP Implementation Services, Inc. (*i.e.* XTP US), albeit purporting to have engaged her under a series of services contracts until February 2020, when she was finally put on company payroll. This arrangement was intended to permit the XTP Entities to do an end-run around their tax and other employer obligations in the United States.  In reality, at all relevant times, Dayn was an employee of XTP— at the very least, of the XTP Entities.

3.      Starting in or about June, 2019, almost immediately upon being informed that Dayn was pregnant, Defendants started targeted attacks intended to undermine her and to make her work experience unbearable, including by replacing her with a man and demoting her (admittedly, due to her pregnancy and family obligations), cutting her direct line of communication to top management and attempting to move company headquarters to a distance well over an hour away from her home where she would have her newborn.   Defendants also engaged in dilatory and obstructive tactics that denied her the employment contract and earned compensation she had long been promised.

4.      Ultimately, Defendants unlawfully terminated Dayn because of her pregnancy, gender and role as a mother and caretaker to her young children and in retaliation after she had engaged in protected conduct by opposing and complaining about their discriminatory practices. In addition to constituting independent acts of discrimination, Defendants' acts detailed below also demonstrate their discriminatory intent vis-à-vis her ultimate termination.

5.      Separately, Defendants also failed to provide Dayn with a wage notice upon hiring and accurate weekly wage statements as required by New York Labor Law.

6.      Dayn's damages are staggering. In addition to monetary damages available to her, including, but not limited to, compensatory and punitive damages, *inter alia*, for violations of Title VII of the 1964 Civil Rights Act, as amended by the Pregnancy Discrimination Act where applicable ("Title VII"), New York State Human Rights Law ("NYSHRL") and New York Labor Law ("NYLL") with attorneys' fees and costs, Dayn seeks injunctive and declaratory relief.

## **THE PARTIES**

7.      Dayn is a citizen and resident of the State of New York.  She resides in Westchester County.

8.      XTP US is a corporation organized and existing under the laws of the State of Delaware.  It is authorized to do business in the State of New York and has its principal place of business in Westchester County.

9.      Upon information and belief, XTP Germany is an *Aktiengesellschaft* (roughly, "stock company") organized and existing under the laws of Germany.

10.      Upon information and belief, XTP Switzerland (together with XTP US and XTP Germany, the "XTP Entities") is an *Aktiengesellschaft* organized and existing under the laws of Switzerland and/or one of its Cantons.

11.      Upon information and belief, Klingler is a citizen and resident of Switzerland and is an XTP executive (Director & Managing Partner), who is also the founder and principal of XTP Switzerland, a shareholder of XTP Germany and a director of XTP US.

12.      Upon information and belief, Dördrechter is a citizen and resident of Germany and is an XTP executive (Chief Operating Officer), who is also a shareholder of XTP Germany.

13.    Upon information and belief, Henrich is a citizen and resident of Germany and is an XTP executive (Managing Director), who is also a shareholder and Chief Executive Officer of XTP Germany.

14.    XTP Germany is the parent company of XTP USA and holds XTP Switzerland to be an office and/or branch thereof.

## JURISDICTION AND VENUE

15.    The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this is a civil action arising under Title VII.  The Court has supplemental jurisdiction over Dayn's related claims arising under New York State laws pursuant to 28 U.S.C. § 1367(a).

16.    The Court has personal jurisdiction of Defendant XTP US because it is authorized to do business and maintains its principal place of business within the district.

17.    The Court has personal jurisdiction of Defendants XTP Germany and XTP Switzerland under Section 301 and one or more provisions of Section 302(a) of the New York Civil Practice Law & Rules (the "CPLR"), because they regularly do, or transact, business in the State of New York, because they contracted and acted as employers or collectively as one employer here and have committed wrongful acts in and concerning New York (both directly and through affiliates, agents and/or instrumentalities) as more fully discussed below.

18.    The Court has personal jurisdiction of individual Defendants Klingler, Dördrechter and Henrich under one or more provisions of CPLR § 302(a) for the reasons described in detail in this Complaint and because each acted as an employer for purposes of New York labor laws.

19.    The Court has personal jurisdiction over all foreign Defendants under CPLR § 302(a), among other things, because they committed tortious acts in and concerning this State, including, but not limited to, illegal discrimination and retaliation against Dayn (including by

reason of her wrongful termination) and misclassification of Dayn's employment causing damages to Dayn (not to mention to this State and the U.S.) out of which Dayn's claims arose.

20.     Venue is appropriately lain in this District because the unlawful employment practices were committed in this District, the relevant employment records are maintained in this District, Dayn resides in and would have worked in this District but for the alleged unlawful employment practices, one of the Defendants has its principal place of business in this District, and there is no other District that has a stronger or substantial connection to the claims.

### ADMINISTRATIVE REQUIREMENTS EXHAUSTED

21.      On February 4, 2021, Dayn timely filed a charge of pregnancy and sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). Dayn amended her charge of discrimination on March 11, 2021.

22.     On July 23, 2021, the EEOC issued a Dismissal and Notice of Rights to Dayn. The EEOC explained that it was closing its file on Dayn's charge and that she had the right to sue the defendants within 90 days thereof.

### FACTUAL BACKGROUND

23.     For nearly 20 years, Anna Dayn has been an executive in the financial services industry.  Her career has focused on asset management and private equity.  Well known and highly regarded in her field, she speaks and writes on areas of interest to the private equity community.  A graduate of the Wharton School of the University of Pennsylvania, Dayn has worked professionally in New York, London and Zurich.

24.     In 2016, Dayn was introduced to the XTP "group", *i.e.*, XTP, a German- and Swiss-headquartered business with international affiliates and over 40 employees.

25.     XTP provides services to pension plans and other large investment groups. Specifically, XTP helps clients to lower their costs by renegotiating the fees charged by the

managers of funds in which the clients invest.  XTP earns money by keeping a percentage of the

savings it obtains for its clients.  Here following is a link to the companies' website:

https://www.xtp-group.com/en/.

26.      XTP's senior management is comprised exclusively of men and, throughout the

parties' relationship, XTP had only one employee other than Dayn who is a woman and held a

position above an entry-level or junior position (albeit one that was well below management).

27.      At the time of Dayn's hiring, XTP did not have a formal US subsidiary or

physical presence in the US or Canada.  XTP executives (in particular, Klingler and Henrich)

told Dayn that although she would be working exclusively for XTP, they did not want to hire her

as an "employee".  They explained that until they obtained paying US clients, Dayn would

officially remain a contractor however would represent herself as an XTP US employee.  This

was a way for XTP to masquerade a US presence all the while evading various taxes or

complying with other obligations as a US regulated employer.  Therefore, they retained Dayn as

a contractor via her personal services company, Dayn Advisors, LLC ("Dayn Advisors"), and

hired and widely showcased her to prospective clients as the person to build and run their North

American business.   They did, however, assure Dayn that she would be put on payroll

eventually.

28.      From the start of the parties' relationship and at all relevant times thereafter, Dayn

was factually and functionally an employee of XTP, specifically, of one, more or all of the XTP

Entities.

29.      At all relevant times for purposes of the claims herein, XTP, including XTP

Entities, have maintained, and continue to maintain, interrelated and centralized operations,

especially with respect to their employees, and were run as one, integrated, single employer and

6

company. XTP held out the different companies within the "group" as "branches" or "offices" of XTP and routinely and repeatedly held itself out to be a single company and employer (and its employees, those of a single corporate structure) both in the U.S. and abroad.

30.     In September 2016 when Dayn and XTP started their business relationship, her personal services company, Dayn Advisors, and XTP Switzerland entered into a personal services agreement (the "Services Agreement").  The Services Agreement provided that Dayn Advisors would provide full-time services in the person of its principal, Dayn, and, among other things, required Dayn not to provide services for a competitor of XTP.

31.     In exchange for Dayn's full-time labor, XTP Switzerland agreed to pay her "a consulting fee of USD $126,000 per annum (payable in monthly instalments [sic] at the start of the month)…." through her company, Dayn Advisors ("Initial Base Salary").

32.     Dayn was also entitled to earn a bonus based on a profitability formula allowing it to keep 15% of all North American income. In fact, the promise that Dayn would keep 15% of the US outfit's revenues, particularly of those generated from clients she brought in, was a key and immutable part of Dayn's compensation package from day 1 and consideration for her to accept and continue employment at the Initial Base Salary, which was well below market for a candidate of her credentials and experience.

33.     As the parties' arrangement required Dayn to devote her full business time to XTP, Dayn Advisors (and, in turn, Dayn) had no clients other than XTP Switzerland, nor did she have any other employment prospects.

34.     While Dayn's Services Agreement appeared on paper to be only with XTP Switzerland, it was understood that her engagement was with XTP, which had headquarters and majority of staff in Germany and had centralized control of its labor relations such that both XTP

Switzerland and XTP Germany (as well as XTP executives who are the individual Defendants herein) controlled every aspect of Dayn's employment.

35.     Dayn was provided or reimbursed for the materials, office space, supplies, travel and entertainment she needed to perform the services contemplated by the Services Agreement.

36.     Despite the fact that Dayn worked full-time for XTP, under the direction and direct supervision of principal Klinger, she was paid as if she were a contractor, which represented a substantial savings for XTP because it was able to avoid, among other things, federal, state and local payroll taxes.  Instead, Dayn Advisors and Dayn paid the appropriate income and payroll taxes.  This arrangement would also permit, and was intended to permit, XTP, most notably, XTP Switzerland, to avoid complying with other obligations of a New York employer.

37.     XTP designated Dayn the head of its North American business.  Dayn had business cards, letterhead, and appeared on printed company presentations for clients; she had a company email signature block and an XTP website biography that identified her as the head of XTP's North American business.  None of those things identified Dayn Advisors—only XTP US and Dayn, personally.

38.     As Dayn's efforts were proving successful and the first major US clients were identified to be signed up, XTP instructed Dayn, for contracting purposes, to form a US subsidiary (XTP US) so that the US client would contract with XTP's now formal US corporate infrastructure for contracting purposes. She did that in late 2016.

39.     Dayn did not have to invest in any items to set up XTP US, either personally or through Dayn Advisors.

40.     At all relevant times for purposes of the claims herein, Dayn's employment was subject to supervision and control of Dördrechter and Henrich, together with that of Klingler, her immediate supervisor.  Each of the individual Defendants had full authority and say over her employment, controlled the terms thereof and had authority to terminate her.

41.     Dayn initially owned 100% of XTP US, with the understanding between XTP and Dayn being that, once they had their first client income in the US, XTP would acquire the majority of ownership of XTP US and formalize it as a subsidiary with Dayn staying in the leadership position and keeping her entitlement to 15% of the US business.[2]

42.     Effectively, XTP used Dayn as a straw person with no benefits of ownership other than her compensation package as agreed upon and set forth in her Services Agreement.

43.     Once the Services Agreement was in place in 2016, Dayn began the full-time effort of finding clients for XTP.

44.     Dayn was dealing in "white space" as clients were not aware of XTP or the sort of services it provides. There was a long lead time between the first contact with a prospective client and the signing by that client of a contract for XTP's services.  There are many reasons for this.

45.     First, XTP's service is unusual (there is virtually no competition in its field, and Dayn had to first create a need for such a novel service and then get XTP hired to fill it).  Getting the chance to speak with decisionmakers is difficult enough; explaining the mere business concept and the value of XTP's services was more challenging.  While saving investment fees was a simple enough concept to explain and understand, no one had heard of such a service and

---

[2]     Dayn in fact remained the sole member of XTP US until she successfully brought in the first large client, a major state pension plan, in 2018.

there were no US-based references or industry-wide track record which Dayn could point to as examples.

46. Second, until the beginning of 2020, the US economy and markets were very strong, and institutional investors were not as focused on cost savings as perhaps they are now.

47. And, finally, XTP was always dealing with very high-level people with virtually unlimited demands on their time. XTP's U.S. business was never their top priority.

48. Notwithstanding these challenges and the low budget Dayn had to work with, Dayn singlehandedly built the brand of XTP in the US and Canada, generated innumerable meetings and test-runs of XTP's services with high level pensions representing hundreds of billions of dollars in assets under management, and, by all accounts, was successful at creating the North American business platform for XTP.

49. In the fall of 2018, after Dayn brought in XTP's first substantial US client, a state pension, XTP made a series of changes involving Dayn and XTP US.

50. First, on October 26, 2018, XTP required Dayn to sell to XTP Germany her 100% membership interest in XTP US. Shortly thereafter, on November 7, 2018, XTP named Dayn President of XTP US although she was still not properly classified as an employee of the company. It also named her a director, together with Klingler, one of XTP's executives. All the while XTP still had not properly classified Dayn an employee of XTP US or organized formal payroll procedures and continued to pay her as a contractor.

51. On or about November 8, 2018, XTP converted XTP US from a limited liability company to a "C" corporation. XTP US was renamed XTP Implementation Services, Inc.

52. Also on November 8, 2018, XTP's first U.S. client signed a services agreement with XTP US. Dayn was solely responsible for bringing this client to the company and was

represented to the client as the lead XTP partner in charge of the client relationship, which was intended to last for at least two years until the client work would be concluded.

53.     At or around the time of these developments, XTP confirmed that Dayn would finally be made a salaried employee of XTP US upon XTP capitalizing the company and subject to execution of an executive employment agreement, which XTP promised to prepare and send to her.  Also at or around this time, Dayn reminded the XTP executives with whom she dealt about their promises regarding increasing her "salary" (then still being paid in the form of consulting fees to Dayn Advisors).

54.     In March of 2019, Dayn Advisors and XTP signed an addendum to the original Services Agreement, extending it to the end of September 2019 because XTP claimed that it was not yet ready to capitalize the US business as promised and that it did not yet have income from its first client, as it normally takes 1-2 years to start receiving revenues under its commission-based model. In the extension agreement, the parties confirmed Dayn's continued entitlement to 15% of XTP's US business as contemplated by the parties, including in the original Services Agreement.

55.     In June of 2019, Dayn informed the partners of XTP (namely, Klingler, Director & Managing Partner, Dördrechter, COO, to whom Dayn reported directly, and others) that she was pregnant and that she anticipated beginning her maternity leave on November 9, 2019, which was her baby's due date.  At the time, Dayn was awaiting the first draft of her executive employment agreement, which Defendants had promised was forthcoming.

56.     Ultimately, Dayn's baby was born on November 12, 2019, and she began her maternity leave then.  With the arrival of her baby, Dayn became the mother and a primary caretaker of three young children.

57.     Between the time Dayn announced her pregnancy and the beginning of her maternity leave, XTP took several actions that were directly related to her pregnancy, familial and caretaker status as well as to her gender and demonstrate, among other things, XTP's discriminatory intent.

58.     On September 6, 2019, Dördrechter, XTP's COO, informed Dayn that a junior analyst on the company's real estate research team in Frankfurt would be moving to the US in early 2020 to assume a new Chief Financial Officer / Chief Operating Officer role for XTP US. Although Dayn was the President of XTP US, she was never consulted about this decision or even informed of this prior to the decision becoming final, whereas previously each key (or even trivial) decision concerning XTP US had been subject to her approval.  The employee is a Russian national with no prior US work experience, or experience in the CFO/COO functions of any company.  Also, the US company was very small and simply did not require an employee at that level.  Despite Dayn's feedback, Klingler and Dördrechter told her that she had no choice in the matter and had to accept this decision.

59.     With the extended Services Agreement between XTP and Dayn Advisors set to expire at the end of September 2019, Dayn and XTP were once again discussing, and were finally set to enter into, an employment agreement.  However, on or about September 24, 2019, Dayn was told that XTP was balking at sending an employment agreement, purportedly due to a number of fabricated issues, contrary to what had always been the parties' understanding with respect to Dayn's would-be employment.

60.     For example, they claimed that they were concerned that Dayn's salary request (which was below market, when it was always understood that her compensation would be much higher than her ask) was too high.  They were also trying to renegotiate Dayn's entitlement to the

15% share of profits that was promised and agreed upon from the onset of her joining the firm, despite admitting and nevertheless acknowledging that it continued to be part of Dayn's compensation.  This worried Dayn the most because her promised profit-share from the North American business she brought to XTP was the most substantial part of her financial incentive to be at the company; it was worth multiples of her salary.

61.     Months came and went without XTP ever sending Dayn a draft employment agreement to memorialize and confirm the terms the parties had already agreed would be honored therein.  Dayn was at the tail end of her last trimester and each passing day made her more uneasy, as XTP kept stalling in providing her the promised employment agreement further memorializing and solidifying their promise on her profit share entitlement on the business she brought in.

62.     On October 25, 2019, just two weeks before her due date, still with no agreement in hand and after it became clear that XTP was not negotiating in good faith, Dayn decided to ask XTP to postpone their contract discussions.  Dayn had already been put under a lot of stress by the Defendants and, with her baby coming imminently, she decided it would be best to put these difficult discussions off for a time until after the baby was born.  She had a phone call with XTP where they reassured her that the contract would be produced after her maternity leave which would entail a salary increase of 50% and honor her 15% incentive compensation for the existing and future US client business. During the period of her maternity leave XTP paid Dayn her new higher salary.

63.     To Dayn's surprise, and approximately a week before her maternity leave was expected to begin, on November 1, 2019, Klingler introduced Dayn to William (Bill) Conlin

("Conlin"). Conlin had been retired for a number of years after a long career in a different financial services business.

64.     Klingler told Dayn that XTP was hiring Conlin as Executive Chairman of XTP US. Dayn was told that Conlin would work primarily with the Frankfurt office of XTP on liquid market analytics, which was closer to his expertise in his prior career. Dayn was specifically assured that her role as the head of XTP would not change and that Conlin's role was primarily advisory. Again, despite Dayn being head of the US business, XTP did not consult or solicit her feedback with this hire.

65.     Dayn returned from maternity leave on February 12, 2020.  She found herself unexpectedly having to speak with Conlin on a daily basis, with Conlin seemingly acting as her superior, despite prior assurances.

66.     Conlin in fact told Dayn at the tail end of her maternity leave that he was in talks with the partners of XTP to move the company's only US office, which was located near Dayn's home in Westchester County, N.Y., closer to his home in Long Island, N.Y., at least an hour's commute from Dayn's home by car.

67.     Shortly after her return from maternity leave, Conlin in fact told her that he was now the "head of XTP US" and that Dayn would have to report to him.

68.     Dayn was also told that all of her work product was to be relayed directly to Conlin as her manager, and so Dayn's previously direct reporting connectivity to the partners at XTP would also be diminished.  Not only was Dayn replaced and thus no longer the head of the North American business, but by now reporting to a new head of XTP US, Dayn had also been effectively demoted.

69.     It was abundantly clear to Dayn that the direct cause of these changes that adversely impacted her employment and wellbeing was her pregnancy. In fact, in or around February 19, 2019, Conlin let it slip to Dayn that he had been put in charge because it was felt that, after just giving birth with a new child to care for, Dayn could not continue to maintain a strong business development pace.  He communicated verbally and by email that her current business development pace, despite having generated the lion's share of XTP's client income, was subpar and that, with him joining, it should be stepped up dramatically.

70.     It was also clear that plans and business decisions were being made by XTP to shut Dayn out from her leadership role and to make her work environment as inhospitable as possible to her as a woman and a mother, presumably so as to induce her to walk away so that XTP would not have to formally terminate her. The office move never took place because of the Covid 19 pandemic but not before causing tremendous stress to Dayn, who had a newborn baby at home and knew being so far away from him would be very difficult, particularly as a nursing mother it was critical that she stay close.

71.     Following news of her pregnancy, while Dayn continued working with her colleagues Marc Becker, Klingler, Dördrechter, Michael Fuss, and some other non-partner level employees at XTP in Europe, she began losing her leadership position and was moved down the chain of command, having been cut out of prior strategic planning and other high-level decision making regarding the US business.  Notably, written and oral communication to clients by XTP partners covering for her while she was on maternity leave continued to refer to her as "head of our US operations," as late as December and January. After Conlin officially joined the firm in February 2020, however, everyone internally started referring to Conlin as the head of XTP US. Dayn was not only forced to report to Conlin but, for the remainder of her time working for XTP,

she was pressured by the officers and other representatives of XTP to transfer the primary partner responsibility of her main pension client to Conlin, and to defer to Conlin regarding every major activity she used to lead.

72.     Further, when Dayn returned from maternity leave in February 2020, the company and she resumed their discussions about an employment agreement.   XTP sent Dayn a draft employment agreement on March 4, 2020. As Dayn feared, XTP was attempting to diminish her profit share from the 15% that she had always been entitled to.  Dayn hired counsel and began to negotiate the employment agreement.  The Covid 19 pandemic had started, and Dayn was motivated to keep her job and find a mutually agreeable solution. Notwithstanding the ongoing negotiations about the agreement, the company finally put her on the payroll of XTP US in March 2020.  Upon information and belief, Defendants' formal recognition of Dayn's employment – albeit without the employment contract she had been promised— was intended to temporarily placate her and to set the stage for her ultimate termination when all the while her abuse and harassment continued.

73.     Nevertheless, the discriminatory conduct was unmistakable.  Among other things, Klingler told Dayn that, with young children at home, the business required her to bring in Conlin to take the lead on her current and future client work. Dayn had to introduce Conlin to her existing client and watch him take primary responsibility from her over the business she had personally procured and cultivated.  Dayn also had to introduce Conlin to client prospects she worked for years to cultivate, effectively transferring primary responsibility from herself to him.

74.     After Dayn returned from maternity leave, Dördrechter stopped taking her calls altogether, maintaining that, with the new line of command, he would be conducting all senior

level discussions pertaining to the U.S. business with Conlin and the junior analyst that he had

brought into the U.S. to act as "COO/CFO".

75.     Prior to March 2020, all of Dayn's compensation was paid by XTP (either

through XTP Germany or XTP Switzerland) through Dayn Advisors and, upon being formally

classified an employee, directly by XTP US. At all times prior to formally becoming an

"employee", and certainly thereafter, Dayn was an employee in fact of XTP, particularly of the

XTP Entities, in every possible way except on paper.

76.     XTP, most specifically, the XTP Entities, controlled every aspect of such

employment; they required Dayn's services to be performed personally, they set an annual salary

for her; they had the right to, and did closely and directly, supervise Dayn's work; they required

her to perform services full time and on their terms, they restricted her ability to perform services

elsewhere and/or for other clients or entities; they provided her with resources and training to

pitch the XTP concept to U.S. clients; they utilized her as a company officer with management

functions and services that were an integral and indispensable part of their U.S. operations; they

held her out as their employee and President of XTP US, including on their website and in

business cards, company letterhead and emails, including at conferences and industry events;

they reimbursed her for business expenses, among other things.

77.     Further, at all such times, each of the individual Defendants, individually and/or

jointly with each other and/or other Defendants herein, individually and/or jointly controlled the

employment of Dayn and were responsible for managing and supervising Dayn, record-keeping

as to Dayn's employment, among other employment functions.

78.     On March 13, 2020, Dayn lodged a complaint to senior leadership of XTP by

email, expressing her surprise at her demotion and stating that she had never been informed that

17

her line of reporting would change. Dayn was concerned that her connectivity to the home office in Frankfurt was gone, XTP's partners now only spoke to Conlin about important decisions about the US office, and Dayn was not included. Dayn's superiors made it clear to Dayn that they took her complaint as insubordination and were very cross on the phone with her about not towing the line.

79.     On April 3, 2020, Conlin told Dayn that the company had asked him, as her superior, to inform her that she had also been replaced as director of XTP US, and that her replacement on the Board of Directors would be Conlin. Conlin told Dayn that it was the wish of XTP that Dayn no longer be on the board of directors. Dayn was told that she would however, continue having the title of President of the company, since the clients all knew her.

80.     Conlin explained to Dayn that her role would now be limited to sales and, for the first time, he told her that, in *his* view, her performance over the prior three years had been sub-par. This comment struck Dayn as odd as it contradicted the facts—she was, after all, responsible for 100% of XTP US' sales and management did agree to her 50% salary raise, not something commonly offered to sub-par performers. Moreover, Conlin had only just joined the company, and so he had absolutely no firsthand knowledge of Dayn's performance.

81.     Negotiations over Dayn's employment agreement became even more complicated. Dayn became frustrated about the lack of clarity surrounding the promised profit sharing (in part because the draft agreement was not written by an English speaker, and clearly not by a lawyer, and was in parts very difficult to understand) and also what were a very heavy-handed set of post-termination covenants, which had never been part of the parties' understanding. The draft agreement initially named Dayn as a Director of the company, but in later iterations the company retaliated against her by taking that part out of the draft after their

18

decision to expel Dayn off the company's board of directors. In the late Spring/early Summer of 2020, XTP suddenly became very silent about finalizing Dayn's employment agreement.

82.    On July 28, 2020, Dördrechter and Henrick, Managing Partners of XTP, called and emailed Dayn and terminated her employment.

83.    Each of the individual Defendants participated in, incited, aided and abetted and brought about the discriminatory conduct complained of herein.  Among other things, they each approved of the discriminatory conduct complained of herein, including her termination, with knowledge of her protected status and because of it. Moreover, they communicated with, and scolded her in connection with her complaint and ultimately punished her for because of it.

84.    Defendants have discriminated against Dayn for having gotten pregnant, given birth, and taken maternity leave. The Defendants retaliated against Dayn once she protested about such poor treatment after her maternity leave ended. The Defendants have also discriminated against Dayn because she is a woman, a mother and the caretaker to her young children, including a newborn.   In addition to the discriminatory comment Conlin made to her, on more than one occasion, men at the company have said things to Dayn such as "now with the baby you won't be able to travel as much", or "at this stage in your life with young children at home, it is good that Bill can take on the client work you're unable to cover".  On the eve of Dayn's departure for maternity leave they hired an older white man to be her superior, misrepresented to her the scope of his authority, replaced her on the board of the company that she had herself set up, developed and originally even owned, and required her to report to Conlin notwithstanding their prior representations.  And then, in spite of the fact that Dayn was responsible for 100% of XTP US' sales, they terminated her, falsely blaming it on poor performance, and denied her her duly earned and agreed upon compensation, misappropriating

19

the fruits of her labor and enriching themselves at her expense.  Based on their direct supervision

of her employment activities, and their decision to remove her as a director from XTP US after

she complained about her demotion, XTP, Defendants are jointly responsible for the illegal

discrimination.

**COUNT I**

**VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT, AS AMENDED BY
THE PREGNANCY DISCRIMINATION ACT**
*PREGNANCY DISCRIMINATION*
**(AGAINST XTP ENTITIES)**

85.     Dayn repeats and realleges each and every allegation in the preceding paragraphs

as if fully set forth herein.

86.     At all relevant times, the XTP Entities were each individually and/or collectively

Dayn's "employer" under Title VII in that they, among other things, either individually and/or

jointly with other XTP Entities (either as joint employers or as a *single* employer) employed at

least 15 employees, including Dayn.

87.     In fact, in or about March 2020, XTP confirmed this in response to an Illinois

State Treasury Request for Proposal, making legal and binding representations under oath that it

has 40+ total employees (inclusive of XTP US employees and employees in Germany and

Switzerland) that would be at the disposal of the client, provided details of XTP US's

headquarters, together with other "branch offices", and attested that XTP had joint management.

88.     To the extent that only XTP US appeared formally to employ Dayn, XTP

Switzerland and XTP Germany each had immediate and full control over all of XTP US's

employment decisions, generally (and with respect to Dayn's employment, particularly) and full

authority as to hiring, firing, discipline, pay and records and XTP, particularly all three XTP

20

Entities, operated as a single, integrated employer with respect to XTP's employees, including Dayn.

89.     By the actions described above, among others, XTP Entities violated Title VII of the 1964 Civil Rights Act, as amended by the Pregnancy Discrimination Act, when they terminated Dayn from her employment because she became pregnant.

90.     As a direct and proximate result of XTP Entities' unlawful and discriminatory conduct in violation of Title VII, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

91.     As a direct and proximate result of XTP Entities' unlawful conduct in violation of Title VII, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**COUNT II**

**VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT**
***DISCRIMINATION BASED ON GENDER***
**(AGAINST XTP ENTITIES)**

92.     Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

93.     By the actions described above, among others, XTP Entities violated Title VII when they terminated Dayn from her employment because she is a woman.

94.     As a direct and proximate result of XTP Entities' unlawful and discriminatory conduct in violation of Title VII, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

95.     As a direct and proximate result of XTP Entities' unlawful conduct in violation of Title VII, Dayn has suffered, and continues to suffer, severe mental anguish and emotional

distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**COUNT III**

**VIOLATION OF TITLE VII OF THE 1964 CIVIL RIGHTS ACT**
***RETALIATION***
**(AGAINST XTP ENTITIES)**

96.     Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

97.     By the actions described above, among others, XTP Entities violated Title VII when they terminated Dayn from her employment because she made a good faith charge against their discriminatory conduct which was in violation of Title VII.

98.     As a direct and proximate result of XTP Entities' unlawful and discriminatory conduct in violation of Title VII, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

99.     As a direct and proximate result of XTP Entities' unlawful conduct in violation of Title VII, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**COUNT IV**

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***PREGNANCY DISCRIMINATION***
**(AGAINST XTP ENTITIES)**

100.     Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

101.    By the actions described above, among others, XTP Entities violated NYSHRL, N.Y. Executive Law § 290 *et seq.*, when they engaged in the discriminatory acts discussed above (regardless of whether or not she was an employee or a nonemployee) and terminated Dayn from her employment due to her pregnancy.

102.    As a direct and proximate result of XTP Entities' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

103.    As a direct and proximate result of XTP Entities' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

## COUNT V

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
N.Y. EXECUTIVE LAW § 290 *ET SEQ.*
*DISCRIMINATION BASED ON GENDER*
(AGAINST XTP ENTITIES)**

104.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

105.    By the actions described above, among others, XTP Entities violated NYSHRL when they engaged in the discriminatory acts discussed above (regardless of whether or not she was an employee or a nonemployee) and terminated Dayn from her employment because she is a woman.

106.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary

and/or other economic harm for which she is entitled to an award of economic damages and other relief.

107.     As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

## COUNT VI

### VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. EXECUTIVE LAW § 290 *ET SEQ.*
### *DISCRIMINATION BASED ON FAMILIAL AND CAREGIVER STATUS*
### (AGAINST XTP ENTITIES)

108.     Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

109.     By the actions described above, among others, XTP Entities violated NYSHRL when they engaged in the discriminatory acts discussed above (regardless of whether or not she was an employee or a nonemployee) and terminated Dayn from her employment because of her familial status and ongoing care for her three minor children, including a newborn baby.

110.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

111.     As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

## COUNT VII

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***RETALIATION***
**(AGAINST ALL DEFENDANTS)**

112.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

113.    By the actions described above, among others, Defendants violated NYSHRL when they terminated Dayn from her employment in retaliation for protected activity because she opposed, and filed a complaint against, practices forbidden by NYSHRL.

114.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

115.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

## COUNT VIII

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***AIDING AND ABETTING PREGNANCY DISCRIMINATION***
**(AGAINST ALL DEFENDANTS)**

116.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

117. By the actions described above, among others, Defendants violated NYSHRL by aiding, abetting, inciting, compelling, coercing and/or engaging in the conduct discriminating against Dayn due to her pregnancy, as described above.

118. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

119. As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

### COUNT IX

**VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW**
**N.Y. EXECUTIVE LAW § 290 *ET SEQ.***
***AIDING AND ABETTING DISCRIMINATION BASED ON GENDER***
**(AGAINST ALL DEFENDANTS)**

120. Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

121. By the actions described above, among others, Defendants violated NYSHRL by aiding, abetting, inciting, compelling, coercing and/or engaging in the conduct discriminating against Dayn because she is a woman, as described above.

122. As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

123.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

## COUNT X

### VIOLATION OF NEW YORK STATE HUMAN RIGHTS LAW
### N.Y. EXECUTIVE LAW § 290 *ET SEQ.*
### *AIDING AND ABETTING RETALIATION*
### <u>(AGAINST ALL DEFENDANTS)</u>

124.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

125.    By the actions described above, among others, Defendants violated NYSHRL by aiding, abetting, inciting, compelling, coercing and/or engaging in Dayn's termination from her employment in retaliation for protected activity because she opposed, and filed a complaint against, practices forbidden by NYSHRL, as described above.

126.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

127.    As a direct and proximate result of Defendants' unlawful conduct in violation of the NYSHRL, Dayn has suffered, and continues to suffer, severe mental anguish and emotional distress for which she is entitled to an award of compensatory damages and punitive damages, along with such other relief that the Court deems just and proper.

**COUNT XI**

**VIOLATION OF NEW YORK LABOR LAW § 190, *ET SEQ.***
***FAILURE TO PROVIDE STATUTORY NOTICES***
**(AGAINST ALL DEFENDANTS)**

128.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

129.    At all relevant times, Defendants jointly and/or individually employed Dayn within the meaning of NYLL § 190, *et seq.*

130.    As Dayn's employers, Defendants were required to provide her with the notice(s) required by NYLL § 195(1).  Defendants knowingly, intentionally and willfully failed to do so.

131.    By reason of the foregoing, Dayn is entitled to maximum recovery for this violation plus attorneys' fees and costs pursuant to NYLL § 198 as well as an injunction directing Defendants to comply with NYLL § 195(1).

132.    As Dayn's employers, Defendants were required, to provide her with regular wage statements as set forth in NYLL § 195(3). Defendants knowingly, intentionally and willfully failed to do so.

133.    By reason of the foregoing, Dayn is entitled to maximum recovery for this violation plus attorneys' fees and costs pursuant to NYLL § 198 as well as an injunction directing Defendants to comply with NYLL § 195(3).

**COUNT XII**

**UNJUST ENRICHMENT/*QUANTUM MERUIT***
**(AGAINST XTP ENTITIES)**

134.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

135.    At the repeated express as well as implied requests of the Defendants, and in reliance of promises they made that she would be paid 15% of the revenues of XTP US clients, Dayn procured in XTP US's first large client, a major state pension plan, in 2018, the revenues from which would not start being collected for 1-2 years.

136.    Defendants wrongfully and illegally terminated Dayn without paying her her earned compensation, including her 15% client commissions before Dayn's client's revenues started pouring in.

137.    Upon information and belief, XTP Entities have started reaping, and are continuing to reap, the benefits of Dayn's labor, the reasonable value of which is hundreds of thousands, if not millions, of dollars, without due payment to Dayn.

138.    As a result of their failure to pay the fair and reasonable value and agreed upon price of Dayn's services, XTP Entities have been unjustly enriched by amounts equity and good conscience require they pay Dayn.

139.    By reason of the foregoing, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

## COUNT XIII

### UNFAIR COMPETITION UNDER COMMON LAW
### *MISAPPROPRIATION OF LABOR, SKILLS AND WORK PRODUCT*
### (AGAINST ALL DEFENDANTS)

140.    Dayn repeats and realleges each and every allegation in the preceding paragraphs as if fully set forth herein.

141.     Defendants engaged in unfair competition under New York law, among other things, by wrongfully using and misappropriating Dayn's labors, skills, and work product, without due and promised compensation.

142.     Defendants violated the principles of the common law of unfair competition of New York, among other things, by attempting to profit, and profiting, from Dayn's valuable rights and their own wrongful acts.

143.     By reason of the foregoing, Dayn has suffered, and continues to suffer, monetary and/or other economic harm for which she is entitled to an award of economic damages and other relief.

## RELIEF SOUGHT

**WHEREFORE**, Dayn respectfully requests the Court to grant her the following relief:

A.     An order declaring that the actions of Defendants alleged in this Complaint amount to unlawful discrimination in violation of Title VII and the NYSHRL;

B.     An award of back pay for Defendants' violations of Title VII and the NYSHRL;

C.     An award of front pay for Defendants' violations of Title VII and the NYSHRL;

D.     An award of $10,000.00 for Defendants' violations of NYLL;

E.     maximum recovery for Defendants' violation of NYLL § 195(1) plus attorneys' fees and costs and an injunction directing Defendants to comply with NYLL § 195(1);

F.     maximum recovery for Defendants' violation of NYLL § 195(3) plus attorneys' fees and costs and an injunction directing Defendants to comply with NYLL § 195(3);

G.     An award of compensatory damages in an amount that would fully compensate Dayn, plus prejudgment interest, for the economic loss, mental anguish, emotional pain and suffering, in an amount to be determined at trial;

H.      An award of punitive damages to Dayn in an amount that would punish Defendants for the excessive, extreme, willful, wanton, reckless, and negligent misconduct alleged in this Complaint that would effectively deter Defendants from future discrimination and other unlawful behavior, in an amount to be determined at trial;

I.       An award of all penalties available under the applicable laws;

J.       An award of reasonable attorneys' fees, the fees and costs of experts, the costs of this action, and interest; and

K.      Such other relief as this Court deems just and equitable.

## **JURY TRIAL**

Dayn demands a jury trial on all issues of fact and damages.

Dated:  New York, New York
        October 18, 2021                                    Respectfully submitted,

_____
Brian C. Dunning
DUNNING RIEVMAN LLP
1350 Broadway, Suite 2120
New York, New York 10018
(646) 873-7522
bdunning@drdllplaw.com

*Attorneys for Plaintiff*
*Anna Belchikov a/k/a Anna Dayn*